# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

Washington Commons LLC, )
　) 
　　　　　　Plaintiff, )
　) No. 04 CV 4371
　-vs- )
　) JUDGE GEORGE W. LINDBERG
Illinois Bell Telephone Company, )
　)
　　　　　　Defendant. )

## MEMORANDUM AND ORDER

This dispute concerns plaintiff Washington Commons' allegations that defendant Illinois Bell is in violation of state and federal law regarding the presence of underground storage tanks ("USTs") at 4425-4439 South Cottage Grove, Chicago, Illinois (the "Property"), currently owned by plaintiff. Defendant was a former occupant of the Property and ran a garage utilizing the USTs.

Plaintiff filed its First Amended Complaint against defendant on January 18, 2005. Plaintiff alleges that petroleum byproduct from the USTs have contaminated the soil, and therefore defendant is in violation of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq*. Counts I and II, under the citizen suit provisions of RCRA at 42 U.S.C. § 6972(a), seek declaratory and injunctive relief, respectively, against defendant as the alleged owner and operator of the USTs. Count III alleges state law claims. On January 26, 2005, defendant filed a motion to dismiss plaintiff's claim under 42 U.S.C. § 6972(a)(1)(A) against it as an operator, which was granted on February 22, 2005.

Currently before the court are the parties' cross-motions for summary judgment. The court grants defendant's and denies plaintiff's motion for summary judgment on all claims under

04 C 4371

RCRA. The court declines to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3).

It is not in dispute that an automotive repair garage and a parking garage were present on the Property since at least 1925. Defendant began leasing both garages in the 1950s from the then current owner, La Salle National Bank. Roy Lindberg[1] subsequently purchased most of the Property in 1965. Mr. Lindberg transferred the Property to Beverly Bank on January 14, 1965. Beverly Bank bought the remainder and became owner of the Property as it currently exists on July 27, 1967. Defendant signed an agreement with Beverly Bank on November 22, 1968, to lease the property starting December 1, 1968, memorialized in a Notice of Indenture of Lease. Neither this executed lease nor any previous leases are extant. The lease term ended shortly before Beverly Bank sold the Property to Mr. Nasim Sweis in May of 1987. Plaintiff bought the Property from Mr. Sweis in November of 2003.

The Property is currently used and zoned for commercial purposes; it is located in a mixed residential and commercial neighborhood. This has remain unchanged since at least the 1920s. Defendant maintained a parking and repair garage on the Property for the duration of its occupancy. In 1968, the two existing garages were demolished and the current structure constructed. In September 1968, P.R. Streich & Sons applied for a permit from the City of Chicago to install two USTs on the Property. Presumably, the USTs were in fact installed at this time. They were never removed and form the basis for this lawsuit. Additionally, an aboveground heating oil tank had been used in one of the destroyed garages and is apparently

---

[1] Judge Lindberg does not know Roy Lindberg and has no known family relationship with him.

buried on the Property. Soil samples taken by plaintiff prior to its ownership revealed contaminants present in the soil in excess of minimum Illinois standards for residential property. Plaintiff alleges these contaminants are the result of releases from the USTs, and is bringing suit under 42 U.S.C. 6972(a)(1)(A) and (B).

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, with sufficient evidence to support its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Pursuant to 42 U.S.C. § 6972(a)(1)(A), anyone may bring suit "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter . . . ." Plaintiff alleges defendant is the owner and operator of the USTs, and is in violation of federal and state regulations promulgated pursuant to Subchapter IX of RCRA. Since plaintiff's claims against defendant as an "operator" were dismissed, there remains only its claims against defendant as "owner." RCRA defines "owner" as:

(A) in the case of an underground storage tank in use on November 8, 1984, or brought

04 C 4371

> into use after that date, any person who owns an underground storage tank used for the storage, use, or dispensing of regulated substances, and
>
> (B) in the case of an underground storage tank in use before November 8, 1984, but no longer in use on November 8, 1984, any person who owned such tank immediately before the discontinuation of its use.

42 U.S.C. § 6991(3). Defendant denies it owns the USTs, and the court agrees. Plaintiff has presented no evidence that defendant took any steps consistent with asserting ownership rights. In fact, P.R. Streich & Sons applied for a permit to install the USTs on September 24, 1968. This is prior to the commencement of defendant's lease with Beverly Bank, who was then sole owner of the property. Plaintiff offers three documents in support of its allegation, none of which show defendant, rather than Beverly Bank, was the legal owner of the USTs.

Plaintiff contends in its Statement of Material Facts that "[i]n 1968, Illinois Bell retained a contractor to install two USTs at the property to store new and used oil," and "[t]he contractor, P.R. Streich & Sons, applied for a permit from the City of Chicago to install two USTs on behalf of the USTs' owner, Illinois Bell." Plaintiff presents a ten-line computer printout as the sole piece of evidence for both paragraphs. Plaintiff does not even cite the source of the printout in this motion. The printout does not expressly state defendant retained or ever contracted with P.R. Streich & Sons, and nowhere does it say who owns the USTs. Without the benefit of any explanation, the court finds it does not support plaintiff's purported statement of fact.

Plaintiff additionally states defendant asserted itself as an owner by filing registration forms with the Office of State Fire Marshall ("OSFM") for the USTs in 1986 and 1987. While defendant indeed listed its name in the pre-printed section designated for owners of USTs, this was the one and only section on the form. In fact, defendant added a notation that it was a

-4-

04 C 4371

"lessee-operator" to contravene the notion it was an owner. The forms themselves state that an owner of a UST must submit them, but do not state *only* an owner may submit. Furthermore, the EPA had encouraged any party with knowledge of a UST, even those other than owners, to register.

Plaintiff's third piece of evidence is a printout of a recent computer database entry from the OSFM, listing defendant as owner. However, like the OSFM registration form, there is no category available other than the default "owner" one. Furthermore, the court is not aware of any authority for the suggestion that an entry in a third party's database can bestow ownership rights.

Plaintiff cites *Griffiths v. OSFM*, 704 N.E.2d 934 (Ill. App. 1998), for the proposition that USTs are presumed to constitute trade fixtures and are the property of the lessee. *Griffiths* found "because the items were installed by the tenant for the purpose of carrying on a trade, the rebuttable presumption is that the USTs are trade fixtures." *Griffiths*, 704 N.E.2d at 936. However, plaintiff has not presented any evidence that it was defendant who installed the USTs in the instant case. Furthermore, when defendant left the Property in 1987, it did not seek to retain the USTs, and Beverly Bank did not seek to sever them from the Property. On the contrary, defendant represented to the OSFM in a letter in January of 1988 that the Property had been sold; it requested the new owner, Mr. Nasim Sweis, be contacted to register the USTs in his name. Even without expressly stating that Mr. Sweis is the new owner, the purpose of the letter is clear, and is an unequivocal expression of defendant's intent.

Defendant contends the USTs are fixtures and permanent additions to the land. Illinois courts have held that "a fixture is, by definition, real property because it is incorporated in or

04 C 4371

"lessee-operator" to contravene the notion it was an owner. The forms themselves state that an owner of a UST must submit them, but do not state *only* an owner may submit. Furthermore, the EPA had encouraged any party with knowledge of a UST, even those other than owners, to register.

Plaintiff's third piece of evidence is a printout of a recent computer database entry from the OSFM, listing defendant as owner. However, like the OSFM registration form, there is no category available other than the default "owner" one. Furthermore, the court is not aware of any authority for the suggestion that an entry in a third party's database can bestow ownership rights.

Plaintiff cites *Griffiths v. OSFM*, 704 N.E.2d 934 (Ill. App. 1998), for the proposition that USTs are presumed to constitute trade fixtures and are the property of the lessee. *Griffiths* found "because the items were installed by the tenant for the purpose of carrying on a trade, the rebuttable presumption is that the USTs are trade fixtures." *Griffiths*, 704 N.E.2d at 936. However, plaintiff has not presented any evidence that it was defendant who installed the USTs in the instant case. Furthermore, when defendant left the Property in 1987, it did not seek to retain the USTs, and Beverly Bank did not seek to sever them from the Property. On the contrary, defendant represented to the OSFM in a letter in January of 1988 that the Property had been sold; it requested the new owner, Mr. Nasim Sweis, be contacted to register the USTs in his name. Even without expressly stating that Mr. Sweis is the new owner, the purpose of the letter is clear, and is an unequivocal expression of defendant's intent.

Defendant contends the USTs are fixtures and permanent additions to the land. Illinois courts have held that "a fixture is, by definition, real property because it is incorporated in or

04 C 4371

attached to realty." *A and A Market v. Pekin Insurance Co.*, 713 N.E.2d 1199, 1202 (Ill. App. 1999) (Citations omitted). Illinois courts have established a three part test to determine whether a disputed item is part of the realty and therefore belongs to the owner, or is not part of the realty and therefore belongs to the lessee: (1) the nature of its attachment to the realty; (2) its adaptation to and necessity for the purpose for which the premises are devoted; and (3) whether it was intended that the item in question be considered part of the realty. *Harrisburg Comm. Unit School District No. 3 v. Steapleton*, 553 N.E.2d 76, 79 (Ill. App. 1990). Of the three, "[i]ntent is the preeminent factor, the other considerations being primarily evidences of intent." *Harrisburg*, 553 N.E.2d at 79; *see also Owings v. Estes*, 100 N.E. 205, 206 (Ill. 1912). Plaintiff has been unable to show that defendant purchased, installed, or attempted to declare ownership of the USTs at any point in a nearly twenty year period. All admissible evidence, in fact, demonstrates the opposite.

The court therefore grants summary judgment in favor of defendant on all claims relating to its status as owner under 42 U.S.C. 6972(a)(1)(A).

Plaintiff claims defendant is in violation of 42 U.S.C. § 6972(a)(1)(B), which allows suit:

> [A]gainst any person . . . including any . . . *past or present owner or operator* of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an *imminent and substantial endangerment* to health or the environment . . . .

(Emphasis added). A key distinction from 42 U.S.C. § 6972(a)(1)(A) is that subsection (a)(1)(B) allows suit against a past operator, which defendant admittedly is. Defendant claims the found contaminants do not constitute an "imminent and substantial endangerment." Plaintiff claims they do, noting the contaminants are in excess of standards set by the Illinois Environmental

-6-

04 C 4371

Protection Agency ("IEPA"). Plaintiff relies on the specific standards listed in an IEPA program, the Tiered Approach to Corrective Action Objectives ("TACO"). 35 Ill. Admin. Code § 742 (2005). TACO was implemented pursuant to the Leaking Underground Storage Tank Program (the "LUST Program"), 415 Ill. Comp. Stat. 5/57 (2005), itself authorized pursuant to Subchapter IX of RCRA. 42 U.S.C. § 6991b(h)(7)(A). Neither TACO nor the LUST Program has been approved by the United States Environmental Protection Agency ("USEPA").

As the name suggests, TACO allows for a tiered approach to remediate contaminated soil. Tier 1 is the most generalized, while Tiers 2 and 3 become increasingly site-specific. TACO additionally allows for different levels of contaminants to remain in the soil depending on whether the site is residential or commercial/industrial. Plaintiff correctly states that TACO allows the site-owner to determine whether it wants to abide by the residential or commercial/industrial remediation objectives. If a site-owner chooses the latter, it must ensure an institutional control is placed on the land. 35 Ill. Admin. Code § 742.1000. Plaintiff represents that the purpose of TACO is to determine whether contamination may present an imminent and substantial endangerment, citing 35 Ill. Admin. Code § 742.100 as authority. However, that section states, in its entirety:

**Intent and Purpose**

a) This Part sets forth procedures for evaluating the risk to human health posed by environmental conditions and developing remediation objectives that achieve acceptable risk levels.

b) The purpose of these procedures is to provide for the adequate protection of human health and the environment based on the risks to human health posed by environmental conditions while incorporating site related information.

Plaintiff has presented no other evidence that a violation of TACO equals a violation of RCRA.

Therefore, the court will analyze plaintiff's federal claim based on the latter.

Plaintiff alleges the levels of benzo(a)pyrene and lead found in the soil are an imminent and substantial danger to human health since they exceed state standards for residential land use, set forth in Appendix B to TACO. Plaintiff also states that found chemicals not listed in TACO pose a similar danger. In November of 2001, soil samples were taken from thirteen locations, at multiple depths, on and near the property. Three of the samples revealed the presence of various contaminants, each at a single depth. In October of 2004, additional soil samples were taken from five different locations, also at multiple depths, in the vicinity of the USTs. Only one sample taken at a single depth indicated contamination. The levels of contaminants are all considerably under the commercial/industrial standards. It is also significant that neither the benzo(a)pyrene nor lead exceed the background levels of those chemicals generally present in soil in the City of Chicago. Plaintiff alleges the existence of these chemicals in excess of Tier 1 residential levels is sufficient to violate TACO, and the background levels are irrelevant. However, TACO does allow for the consideration of background levels when setting remediation objectives under Tiers 2 and 3. 35 Ill. Admin. Code § 742.400. Also, the mere presence of contaminants does not constitute a violation of RCRA. The "endangerment must be 'substantial,' which suggests that an exceedingly low risk of harm or a risk of only minor harm will not support an action." *Davies v. NCRA*, 1996 WL 529208, at *2 (D. Kan. Jul. 12, 1996).

In order for contaminated soil to be a danger, there must be some method, or exposure route, allowing human contact with the soil. *Price v. U.S. Navy*, 39 F.3d 1011, 1029-20 (9th Cir. 1994). Assuming, *arguendo*, the soil contains high levels of contaminants, plaintiff has not shown any viable exposure routes exist. The contaminants are located either under a concrete

04 C 4371

floor in the basement of the building, or under the paved parking lot. In fact, plaintiff's own expert, in his initial report regarding the contaminants found in November of 2001, said "the building slab is an approved engineered barrier, [and] the contaminated soil in this area does not present a significant threat to human health or the environment." Exhibit 19, Def.'s Mot. for S. J. The contaminated soil found in October 2004 is also underneath that concrete slab. Plaintiff's same expert, in a later report, states there is an imminent and substantial endangerment, but only because the levels exceed TACO Tier 1 residential standards. Plaintiff's expert again admits that the concrete slab may constitute an approved engineered barrier, however. Defendant's expert states the concrete slab is a sufficient engineered barrier. Plaintiff has no evidence the slab may not be sufficient, but merely states that only the IEPA is authorized to make that determination.

Plaintiff has presented no evidence that the contaminated soil may migrate to other properties. The only other possible source of contamination are chemicals in the groundwater slightly in excess of state residential standards. However, there are no wells on the Property and no other access to the groundwater. Additionally, there is a City of Chicago ordinance prohibiting any wells from being dug on the Property. Even absent the ordinance, plaintiff has not represented there is any need for a well on the Property, nor would a well make the Property more marketable. The Property is located within the borders of the City of Chicago. Plaintiff has presented no evidence comparable property with working wells even exists.

The court finds that plaintiff has not satisfied the requirements of subsection (a)(1)(B). Courts have granted summary judgment for a RCRA defendant even when there was "no question that the levels of contamination present at the Site may warrant future response action, [because] the plaintiff cannot establish either a current risk of 'substantial or serious' threatened

04 C 4371

harm, or 'some necessity for action.'" *Foster v. US*, 922 F.Supp. 642, 662 (D.D.C. 1996) (quoting *Price v. US*, 39 F.3d 1011, 1019 (9th Cir. 1994)). In light of the low levels of contaminants in the soil, and the lack of any demonstrable exposure routes, the court finds plaintiff has not shown the possibility of a substantial danger to any group of people.

Plaintiff also alleges defendant is in violation of 415 ILCS 5/12(a) with regard to the formerly aboveground heating oil tank buried on the premises. Since these tanks are expressly excluded from RCRA under 42 U.S.C. § 6991(l)(1), and the IEPA LUST Program is not approved by the USEPA, this argument does not raise a federal issue and need not be addressed at this time.

Plaintiff has been unable to provide any direct evidence that defendant ordered, installed or paid for the USTs. In fact, plaintiff has not shown that defendant even occupied the property when the USTs were installed. All evidence presented to the court demonstrates defendant intended the owner of the property retain ownership of the USTs. Therefore, defendant's motion for summary judgment on the 42 U.S.C. § 6972(a)(1)(A) claim is granted.

Plaintiff states, *inter alia*, that a violation of TACO's Tier 1 remediation objectives demonstrates an imminent and substantial endangerment to human health. Plaintiff has not provided sufficient authority for that representation, and the court has been unable to find support for it anywhere in the text of TACO or relevant case law. Accordingly, plaintiff must show the contaminants in the soil "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Plaintiff has not met this burden, and therefore defendant's motion for summary judgment on this claim is granted.

Defendant has not moved for summary judgment on Count I of plaintiff's Amended

04 C 4371

Complaint. However, Counts I and II allege a violation of the same federal statute, and differ only in the type of relief sought. Courts may grant summary judgment *sua sponte* when appropriate, assuming the party against whom judgment is being granted had proper notice allowing a response. *See Goldstein v. Fidelity*, 86 F.3d 749 (7th Cir. 1996); *Reynolds v. Serfling*, 2002 U.S. Dist. LEXIS 14660 (N.D. Ill. Aug. 7 2002). In the instant case, no additional arguments for Count I could be made that plaintiff did not assert for Count II. The court therefore *sua sponte* grants summary judgment in favor of defendant as to Count I. Because summary judgment is being entered in favor of defendant on all of plaintiff's federal claims, the court declines to exercise supplemental jurisdiction to decide plaintiff's state law claims. *See* 28 U.S.C. § 1367(c); *Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 764-65 (7th Cir. 1999).

**ORDERED:** Defendant Illinois Bell Telephone Company's motion for summary judgment with respect to Count II of the amended complaint is granted. The court *sua sponte* grants summary judgment in favor of defendant with respect to Count I of the amended complaint. Plaintiff Washington Commons LLC's motion for summary judgment is denied.

Judgment in favor of defendant and against plaintiff on Counts I and II and dismissing Count III without prejudice will be set forth on a separate document and entered in the civil docket. Fed. R. Civ. P. 58, 79(a).

ENTER:

GEORGE W. LINDBERG
Senior U.S. District Judge

DATED: July 11, 2005